## Haynes v. Commonwealth.

(Decided June 27, 1928.)

### Appeal from Magoffin Circuit Court.

(Homicide.—Evidence held sufficient to sustain conviction of manslaughter as against claim of self-defense.

T. J. ARNETT for appellant.

J. W. CAMMACK, Attorney General, and GEO. H. MITCHELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY COMMISSIONER SANDIDGE— Reversing.

Appellant was tried in the Magoffin circuit court under an indictment which charged him with murder; the jury found him guilty of manslaughter, and fixed his punishment at confinement in the penitentiary for 13 years; judgment was entered accordingly; his motion and grounds for a new trial were overruled; and he has appealed. The chief argument made for appellant is that the verdict is flagrantly against the evidence, and this presents the only serious question shown by the record. Its consideration, of course, makes it necessary to summarize the evidence.

Appellant, Haynes, killed his son-in-law, Willie Farris. The accused is approximately 50 years of age and small of stature. Farris was 22 or 23 years old when killed, and much larger and stronger than appellant. Farris had married the 19 year old daughter of appellant about 5 months previously, and he and his wife lived some 4 miles from where her father lived. It is not shown that appellant ever said or did anything prior to

the occasion when this tragedy occurred indicating that he entertained malice or unkind feelings toward his son-in-law, Farris.

Shortly prior to the homicide, a younger daughter of appellant had visited in the Farris home, and when she returned to her own home left some of her clothing there. On the day of the homicide, appellant carried a turn of corn to a mill near where Farris lived, and, leaving it to be ground, proceeded to Farris' home to see his daughter and procure the clothing which his younger daughter had left there. He spent perhaps an hour there with his daughter. No one else was present. It was agreed that the daughter and son-in-law would go home to spend the night with appellant if Farris would be willing, and appellant decided to wait until he should come in from work. Appellant and his daughter finally decided that they would go as far as the mill where appellant's corn had been left and there wait for her husband, hoping thereby to save the latter the walk from the mill home and back. Appellant left the house to get the mule ready for the return journey, while his daughter prepared herself for the trip. Before she left the house, appellant saw her husband coming and notified her of that fact. When Farris reached the place where appellant was standing, they exchanged greetings, and deceased invited appellant back to the house with him. Appellant re-entered the house.

The wife of deceased, who was introduced as a witness by the commonwealth, testified that, when he learned that it was proposed that he and she go spend the night with her father, he immediately informed her that such would not be done. His pronouncement that they would not go was so emphatic that it was clothed in profane and blasphemous language. Appellant suggested that he had not come to take his wife home, but came merely for the clothing which the younger daughter had left there and not for any kind of trouble. Deceased then cursed appellant, and ordered him out of his house. Appellant departed immediately, still disclaiming any intention of offending deceased or having trouble with him. After her father had left the house, deceased again cursed his wife, and suggested to her that, as she appeared so keen to go home with her father, she should do so, and shoved and kicked her from the door. She proceeded to where her father had unhitched the mule, and was about to

mount it, when Farris called to her: "Myrtle, by God you get on that mule and I will knock you off." She and her father then started off walking, but her husband quickly overtook her and lay hold of and slung her to the ground. Asked what then happened, she testified:

"I looked at dad, and he was crying, and he said, 'Willie, I didn't come for any trouble,' and Willie hit me two times with his fist and grabbed me by the arm; and dad says, 'I didn't come for trouble;' and Willie said, 'By God, you have found trouble; I am going to kill you both.' "

He then had his right hand in his pocket, and his left hand reached behind her, caught hold of her father, and jerked him to his knees, just at which time appellant drew his pistol and fired a single shot. What happened after the shot was fired is summarized by the witness for the commonwealth in this testimony:

"Q. Did your husband speak after he was shot? A. He could have spoke a whole lot after he was shot; he slung me around the mule and got dad down.

"Q. Do you know why your dad didn't shoot again? A. I had hold of the gun."

No other witness testified for the commonwealth as to the facts of the homicide.

As was proper under the peculiar circumstances of this case, the commonwealth's attorney was given great latitude as to both the form and range of the questions propounded to this witness. His examination of her was more in the nature of a cross-examination than otherwise. While examining her, he was permitted to interrogate her at length as to variance between her testimony here and the testimony she had given while before the grand jury. In some instances she admitted that her testimony while before the grand jury differed from the testimony she was deposing to the jury, and assigned as a reason that she was afraid of her husband's relatives while testifying before the grand jury. In a great many instances, in which the attorney for the commonwealth interrogated her as to whether she had testified differently while before the grand jury, she denied that such was the case, the matter ended there, as in such instances no effort was made to show that she

had testified differently before the grand jury. The particulars in which she admitted making statements while before the grand jury different to those being made to the jury show the variation to be wholly immaterial. A witness for the commonwealth described the location of the wound thus:

> "The bullet hit him in the left arm about there (indicating) and went behind the arm bone and lodged right back there; on the right shoulder blade was a puff and blue place."

Upon the assumption that the puffed and blue place on the right shoulder indicated the locality where the bullet lodged, this witness stated that it ranged upward about an inch in passing through deceased's body. Another witness who examined the dead body stated that the bullet entered "the left arm on the back side of the muscle." His testimony was that the discoloration on the body about the shoulder of the other arm was so large that he could not get any indication as to the range of the ball or where it lodged. The one of these witnesses who testified as to the range of the bullet also testified that in his opinion appellant could not have fired the shot which ranged through deceased's body as he testified it did while on his knees. This, of course, depends altogether upon the position of the body of the person who was shot at the time the shot was fired. If, as the witness for the commonwealth and defendant testified, deceased caught and jerked appellant to his knees with his left hand, it it altogether probable that in doing so he so bent his body that a shot fired by appellant while on his knees would strike him and range through his body just about as the witness described the shot which struck deceased. The location of the wound in the body and the scant evidence as to its range appear rather to corroborate the version of the tragedy given by the witness for the commonwealth and by the defendant, which, without dispute, make a case of self-defense for him.

This homicide occurred on April 23, 1927. The grand jury of Magoffin county was then in session, and immediately indicted appellant. His trial was had May 4, 1927, less than two weeks after the homicide. It seems wholly incredible, and there seems no ground for the inference, that within that short a time after her husband was killed, the witness for the commonwealth, the surviving widow of the deceased, could have brought herself to

the point where she could fabricate a case of self-defense even for her father. Under the facts appearing herein, this court is constrained to the view that the verdict of guilty imposing 13 years' confinement in the penitentiary upon appellant can but be regarded as flagrantly against the evidence, and that the judgment herein for that reason must be reversed.

Reversed, and remanded for a new trial consistent herewith.